---

## THE B & C.

*(District Court, N. D. Illinois.* November 5, 1883.)

**1. ADMIRALTY JURISDICTION—CANALS.**

A canal used by vessels engaged in interstate traffic as a public water-way, though entirely within the limits of one state having exclusive control of it, with power in such state to close it at any time, is a part of the "navigable waters of the United States," and subject to the jurisdiction of admiralty.

**2. CONTRIBUTORY NEGLIGENCE.**

The master of a vessel who, seeing that a collision is imminent, fails to use every means in his power to avert it, or abate the consequence, is guilty of contributory negligence, though the accident was caused by the negligence of another.

**3. DAMAGES—APPORTIONMENT.**

Damages on account of a loss occasioned by the negligence of both parties will be equally divided between them.

In Admiralty.

*Schuyler & Kremer,* for libelant.

*Robert Rae* and *A. B. Jenks,* for respondent.

BLODGETT, J. This is a libel to recover damages for a collision which took place between the canal-boat Brilliant, owned by libelant, and the steam canal-boat B & C, on the waters of the Illinois and Michigan canal, about four miles from Bridgeport, the evening of August 8, 1882. Two defenses are urged:

(1) That the tort complained of is not within the jurisdiction of admiralty, having occurred on the waters of the Illinois and Michigan canal, an artificial water-way, wholly within the jurisdiction of the state of Illinois, and constructed and controlled by the state. (2) That the collision was occasioned by the negligence of those in charge of the Brilliant, and not by reason of any fault of those in charge of the B & C.

This question of jurisdiction was before the district court of the southern district of New York in the case of *Malony* v. *City of Milwaukee,* 1 FED. REP. 611, where it was held that the court had jurisdiction of this class of cases. I cannot more clearly state my own

conclusion as to the present condition of the law on this point than by quoting from the opinion of Judge Choate in that case:

"Without going at large into a discussion of the reasons for and against the jurisdiction, it is enough for the disposition of the point in this case to say that, upon a careful perusal of the opinions delivered by the supreme court, which touch upon the question, it seems to me that the test established for determining the jurisdiction in admirality, in a case of alleged maritime tort, not on tide-water, is whether the place in which it was committed is upon the 'navigable waters of the United States,' and that an artificial water-way or canal, opened by a state to public use for purposes of commerce, and while, in fact, used as a highway of commerce between the states of the Union, and between foreign countries and the United States, is 'navigable water of the United States,' within the meaning of that term as used to define and limit the jurisdiction of the admiralty courts; nor, as it seems to me, is there any force in the suggestion that this proposition trenches upon the rightful power and jurisdiction of the state through whose territory and by whose law, in force for the time being, the canal is so opened and used, because the exercise of this jurisdiction does not in any way in itself impair or affect the right of the state, whatever that right may be, to withdraw or terminate that dedication of its property to the public uses of commerce. At any rate, considering the present state of authority and practice in the courts inferior to the supreme court, I do not feel at liberty to decline the jurisdiction."

The same view of the law was taken by Judge Emmons in the case of *The Avon*, 1 Brown, Adm. 170. See, also, the case of *The Oler*, 14 Amer. Law Reg. 300. And this court has taken jurisdiction without challenge of several cases of tort occurring on the Welland canal. I therefore conclude that this question of jurisdiction may be considered as settled, until the matter shall be otherwise adjudged by the supreme court of the United States. If there is jurisdiction in admiralty over torts committed on the Welland canal, I can see no reason or principle which should deny such jurisdiction of torts occurring on the waters of the Illinois and Michigan canal. The craft used upon this canal, although not of as large tonnage as those usually navigating the Welland canal, are yet of the tonnage which brings them within the cognizance of admiralty courts. It may be urged, I think, with some force in this case, that the Illinois and Michigan canal is a carrying place connecting the waters of the Mississippi and St. Lawrence rivers, within the meaning of the ordinance of 1787, and by such ordinance is made a common highway for all citizens of the United States. Another consideration which it seems to me is not to be overlooked in determining the control of admiralty over this water-way, is the fact that, although constructed by the state of Illinois, the cost was largely defrayed by an appropriation of the public lands of the United States, thus giving it, both by the ordinance and the means from which it was built, the character of a national thoroughfare. The defense as to jurisdiction will therefore be overruled.

As to the defense upon the merits, it appears from the proof that the canal-boat Brilliant was on a voyage from Morris on the line of the canal to Chicago, in tow of the steam canal-tug Fearless; that the

Fearless was attached by iron rods directly astern of the Brilliant; that is, the tug and tow were so fastened together that the Brilliant was pushed ahead of the Fearless, so that they were practically one boat for the purpose of navigation. The Fearless was also towing astern two other canal-boats; that the B & C was on a voyage from Chicago to some point down the canal; that by the rules of the canal the Fearless and her tows should have passed the B & C and her tows port to port; that is, each should have kept to the starboard, unless one of them signaled that he wished to pass on the starboard side of the other. Under these circumstances, the master of the Fearless, on first making out of the lights of the B & C, sounded two whistles, which was the signal that he wished to pass the B & C starboard to starboard, instead of port to port. The master of the B & C testifies that this signal was answered with two blasts, which was an acquiescence in the request of the Fearless, but the master of the Fearless states he did not hear the response of the B & C, and shortly after he sounded two whistles again. To this the master of the B & C says he also responded affirmatively, and put his boat over to port, so as to pass on the starboard side of the Fearless and her tows. The master of the Fearless states that, not hearing a response from the B & C to his signals to pass starboard to starboard, he put his boat over to starboard, where he would have gone without signals, and then saw, when the boats were very near each other, that the B & C had gone over where he had first signaled him to go, and to which signal the master of the Fearless had, as he says, heard no response. On discovery that the two boats were on the same side of the canal, and were approaching each other nearly end on, the master of the Fearless sounded one blast of his whistle, which was a request for the B & C to pass him on the port side, and at the same time the Fearless reversed and backed her wheel. This last signal for the port side was heard on the B & C, and an attempt was made to comply with it, but the boats were then too near each other, and the B & C collided with the Brilliant, and the Brilliant was sunk.

It is evident from all the proof in the case that there was a confusion of signals. The Fearless signals were heard on the B & C and responded to; and the B & C took the side requested or indicated by the signals. The Fearless, however, did not hear the answer to her signals, and therefore undertook to do at a late moment what she would naturally in the ordinary course of navigation have done,—that is, keep to the right or starboard,—but found, when too late, that the B & C had complied with the request and put herself in a position to pass starboard to starboard. I think the Fearless, hearing no response to the signal for starboard to starboard, should have stopped until she got an answer; but, instead of doing so, she kept on, but took the contrary side of the canal from what her signals had indicated, and found at the last moment the B & C had taken the course requested by the

signals. I therefore think the Fearless was at fault in putting the Brilliant, her tow, at the same side of the canal where she had, by her signals, requested the B & C to go; but I also conclude from the proof the B & C was going very fast at the time the two boats found themselves on the same side of the canal,—in fact, faster than was consistent with safety under the circumstances,—and that she did not use all efforts in her power to avoid a collision after such an event became imminent. The B & C was going probably, at least, at the rate of four miles an hour when she heard the signals from the Fearless; her master says that he then checked down to two and a half or three miles an hour, and was going at that rate when he discovered the Brilliant right ahead of him. At this time, I think from the proof, there was still sufficient room in which the B & C could have stopped, or, at least, her headway might have been sufficiently checked so as to have materially diminished the force of the collision, but no effort was made on the part of the B & C to stop. The B & C had two wheels, which were arranged so as to work in opposite directions, thus greatly increasing her capacity for making a short turn; but this expedient was not resorted to. The master of the B & C, it seems to me, finding that by the mismanagement on the part of the Fearless she was on the same side of the canal with himself, instead of stopping and doing all he could to prevent a collision,—although the peril had not been occasioned by his negligence,—kept on at substantially his full rate of speed, merely using his helm to change the course of his boat. It is manifest that he had other resources at his control which he did not use or attempt to use, and the result was the collision complained of, with the serious consequences to the Brilliant.

I do not assume to hold from the proof that the collision would have been wholly avoided if the master of the B & C had, in the emergency, adopted the expedients indicated; but I think the force of the blow would have been very materially diminished, and probably the serious damage avoided, if the master of the B & C had promptly resorted to all the means in his power to avert the collision.

I therefore come to the conclusion that there was mutual negligence, and that this is a proper case for a division of the damages between the two boats; and the decree will be that the damages be ascertained and divided equally between the libelants and respondents.